1                   UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE

2

3  IN RE:                   .  Chapter 7
                         .  Case No. 22-10293 (BLS)

4  EAM 40 MEADOW LANE, LLC,   .
                         .

5        Debtor.         .
                         .

6  . . . . . . . . . . . . . . .  .
                         .

7  IN RE:                   .  Chapter 7
                         .  Case No. 22-10294 (BLS)

8  EZL 40 MEADOW LANE, LLC    .
                         .  Courtroom No. 1

9            Debtor.        .  824 Market Street
                         .  Wilmington, Delaware 19801

10                      .
                         .  Monday, May 2, 2022

11  . . . . . . . . . . . . . . .  10:00 a.m.

12               TRANSCRIPT OF ZOOM HEARING
        BEFORE THE HONORABLE BRENDAN L. SHANNON

13           UNITED STATES BANKRUPTCY JUDGE

14  <u>APPEARANCES</u>:

15  For the Debtor:        Lisa B. Tancredi, Esquire
                       WOMBLE BOND DICKINSON, LLP

16                      100 Light Street
                      26th Floor

17                      Baltimore, Maryland 21202

18

19  (APPEARANCES CONTINUED)

20  Audio Operator:        Lesa Neal, ECRO

21  Transcription Company:   Reliable
                      The Nemours Building

22                      1007 N. Orange Street, Suite 110
                      Wilmington, Delaware 19801

23                      Telephone: (302)654-8080
                      Email:  gmatthews@reliable-co.com

24

  Proceedings recorded by electronic sound recording,

25  transcript produced by transcription service.

1  <u>APPEARANCES (CONTINUED)</u>:

2  For the Chapter 7
   Trustee:                 John T. Carroll, II, Esquire
3                           COZEN O'CONNOR
                            1201 North Market Street
4                           Suite 1001
                            Wilmington, Delaware 19801
5
                            Eric L. Scherling, Esquire
6                           One Liberty Place
                            1650 Market Steet
7                           Suite 2800
                            Philadelphia, Pennsylvania 19103
8
   For YH Lex
9  Estates, LLC:            Tracy Klestadt, Esquire
                            KELSTADT WINTERS JURELLER SOUTHARD
10                             & STEVENS, LLP
                            200 West 41st Street
11                          17th Floor
                            New York, New York 10036
12

13 For Ranee Bartolacci
   and Ermitage One, LLC:   Pankaj Malik, Esquire
14                          YK LAW, LLP
                            32 East 57th Street
15                          8th Floor
                            New York, New York 10022
16

17

18

19

20

21

22

23

24

25

1                              INDEX

    MOTIONS:                                           PAGE

2
    Agenda
3   Item 1:   Motion of Chapter 7 Trustee for an Order        3
                Approving Stipulation Between Chapter 7
4               Trustee and YH Lex Estates LLC Pursuant to
                Fed. R. Bankr. P. 9019
5               [Filed 4/25/2022; Docket No. 21/15]

6             Court's Ruling:                          61

7


8                            WITNESSES

9   WITNESSES CALLED
    BY THE DEBTORS:                                    PAGE

10

11        GEORGE MILLER

12        Direct examination by Mr. Carroll           38

13        Cross-examination by Ms. Tancredi           42

14        Cross-examination by Ms. Malik              47

15        Cross-examination by Mr. Klestadt           51

16

17  Transcriptionist's Certificate                    68

18

19

20

21

22

23

24

25

1    (Proceedings commenced at 10:01 a.m.)

2            THE COURT:  Good morning, all.

3            This is Judge Shannon.  I understand from the

4    court reporter that all necessary parties have joined.

5            Before we go any further, can I get a thumbs-up

6    that people are able to see and hear me.  All right.  I see a

7    lot of thumbs.  That's good news on a Monday morning.

8            This is a hearing in the matter of EAM 40 Meadow

9    Lane, LLC, a Chapter 7 case.  The case number is 22-10293.

10            What I have before me is the trustee's expedited

11    motion for an order approving the stipulation between the

12    trustee and YH Lex Estates.  I have received a number of

13    letters to the Court from parties that were filed last week

14    and I have also received the debtor's opposition, which I

15    believe was filed on Friday evening, and I've had an

16    opportunity to review that, and I have the debtor's amended

17    agenda or the trustee's amended agenda.

18            I will hear first from counsel to the trustee.

19    Good morning, Mr. Carroll.  Good to see you.

20            MR. CARROLL:  Good morning, Your Honor.  Thank

21    you.

22            Your Honor, I thought what I might do is just give

23    a brief background and then go from there.  What we're

24    dealing with in connection with the two cases is two Delaware

25    LLCs; the one being EAM 40 Meadow Lane, LLC, which has its

1  sole asset -- it has as its sole asset, a residence which was

2  located at 40 Meadow Lane in Southampton, New York, on what

3  was known as Billionaires' Row.  That's what I'm going to

4  refer to today as "the property."

5          The other LLC is EZL 40 Meadow Lane, LLC, and that

6  holds the 95 percent member interest in the other debtor, in

7  the EAM debtor.  And a gentleman by the name of Nir Meir owns

8  the other 5 percent of EAM.

9          With regard to the EZL debtor, there -- it is

10 subject to some dispute as to whether Nir Meir owns 100

11 percent of the membership interest or his wife, who is Ranee

12 Bartolacci, owns 95 percent and Mr. Meir owns 5 percent.

13         The trustee, and I think you've probably seen it

14 in some of the letters, Your Honor, has been advised that

15 Justice Cohen, who's presiding over what's been defined as

16 "the proceeding," has ruled that Mr. Meir is *estopped* from

17 denying that he has the 100 percent membership interest.

18         What has triggered all this activity is the fact

19 that the property was sold by EAM on April 5th of 2021 for

20 $42,923,600 and from those sale proceeds, Mr. Meir

21 (indiscernible) certain payment transfers in May, including

22 many different transfers, including two of particular

23 interest, which is $10,587,387, which was distributed to

24 Ranee Bartolacci, his wife, and $2 million to Ermitage One,

25 LLC, which is an entity purportedly controlled by

1  Ms. Bartolacci.

2         Today, the trustee is seeking approval of a

3  stipulation between himself and an entity by the name of "YH

4  Lex Estates, LLC," which is intended to prevent the further

5  dissipation of sale proceeds and to recapture the same so

6  they can be administered by the bankruptcy estates.  YH Lex

7  Estates, LLC, which is the counterparty to the stipulation is

8  a judgment creditor of Nir Meir, holding a judgment for some

9  $20 million and has engaged in extensive discovery

10  surrounding execution in an effort to recover on his

11  $20 million judgment; however, I want to point out to the

12  Court that YH Lex Estates is not presently a creditor of the

13  bankruptcy estate.

14         So, with that background, I just want to run

15  through the stipulation to outline what it does provide and

16  what it does not provide.  At its core, the stipulation

17  provides that a special proceeding by YH Lex Estates

18  scheduled for trial this Tuesday, tomorrow, could be remanded

19  from the United States Bankruptcy Court in the Southern

20  District of New York, where it had been removed by Mr. Meir,

21  back to the Supreme Court of New York.  That underlying

22  proceeding seeks multiple types of relief.  It seeks turnover

23  of certain assets, it seeks an accounting, and it also seeks,

24  basically, a determination of fraudulent conveyance, with

25  respect to payments, which were made to Ms. Bartolacci and to

1  Ermitage One.  They seek to avoid that transfer.  Those sale

2  proceeds that came from the property of EAM to Ms. Bartolacci

3  and Ermitage One, and it seeks that as a fraudulent

4  conveyance, an independent action that the creditor would

5  hold on YH.

6        Now, what does the stipulation provide for benefit

7  of the estates?  It actually provides a lot.  It resolves the

8  issue that any recoveries by YH for Bartolacci or Ermitage

9  resulting from the special proceeding are property of the

10 estate of EAM.  So, it resolves that issue.

11        It resolves that many (audio interference) with

12 respect to the proceeding, will be held by the estate of EAM

13 by the trustee and that they'll be distributed in accordance

14 with the Bankruptcy Code's priority scheme under 726.

15        It resolves in Section 4 that any compromise or

16 settlement of the proceeding or the judgment entered in the

17 proceeding is subject to approval, not only of the trustee,

18 but also of the Bankruptcy Court.  It contains, also in

19 Section 4, a recognition of the trustee's right to intervene

20 in that special proceeding.  It also provides that YH agrees

21 to assist the trustee in reviewing claims asserted against

22 the debtors in the bankruptcy case and to provide background

23 knowledge and information regarding each claim asserted.

24        It provides the benefit of an imminent trial to

25 prevent the continuing passage of time which will enable

1  dissipation and spending of EAM's sale proceeds.

2         Now, having received all that benefit to the

3  estate, what did the estate give up in the stipulation?

4  Candidly, I think they gave up very little.  They gave up the

5  stay and the ability to transfer the special proceeding to

6  this court for a trial down the road.  It should be noted on

7  the form that a jury trial had been demanded in connection

8  with that proceeding.  It also had the estate, to the extent

9  that YH made recoveries from Bartolacci or Ermitage, the

10 trustee consented to YH being granted a claim pursuant to

11 503(b) for a substantial contribution; however, it should be

12 noted that that's subject to an application by YH upon

13 approval by the Court -- by the Bankruptcy Court.  And the

14 trustee reserved the right to review and object to

15 reasonableness of the amount.

16        So, the trustee in that provision is merely

17 consenting that he would not oppose the 503(b) in the event

18 that money is brought into the estate, but it is still

19 subject to application and the Bankruptcy Court's approval.

20        THE COURT:  Mr. Carroll, if I can, while you're on

21 the terms of the stipulation, at paragraphs 49 through, I

22 think, 54 of the debtor's response in opposition that was

23 filed over the weekend, there is a concern expressed about

24 the trustee's ability to anoint Mister, or YH with standing.

25 And I'm looking at, I think, specifically, paragraph 7 of the

1 | stipulation, and I just want to make sure I understand.

2 |        The stipulation provides that the trustee

3 | consents, but if I were to approve the stipulation, I don't

4 | read this -- and I'd like clarification from the trustee -- I

5 | do not read this to mean that I have provided or granted

6 | standing to YH.  That would be the subject of a further

7 | proceeding.  What YH has and what the estate has is an

8 | understanding that Mr. Miller would not object to that sort

9 | of a request.

10 |        Do I understand that correctly, Mr. Carroll?

11 |        MR. CARROLL:  That is correct, Your Honor.

12 |        THE COURT:  Okay.

13 |        MR. CARROLL:  I believe it indicates that in that

14 | Section 7 of the stipulation, it's a mere consent and it

15 | actually indicates that others may object to that standing

16 | and that the trustee would support the efforts to get

17 | standing, but it's still subject to the Court's approval and

18 | objection by other parties.

19 |        THE COURT:  So noted.  You may proceed.  Sorry for

20 | the interruption.

21 |        MR. CARROLL:  Your Honor, the estate also agreed

22 | that provided that if there are any recoveries in the

23 | proceeding or on account of enforcement of the judgment comes

24 | out of that proceeding from Bartolacci or Ermitage, and that

25 | those funds are turned over to the trustee as property of the

1 estate, that once the trustee has completed distribution of

2 those funds to EAM's creditors who hold allowed claims, then

3 the trustee agreed to make a distribution to YH as the sole

4 economic interest holder of EZL's interests in EAM.

5          Now, what should be noted is that it provides that

6 it's pursuant to and to the extent of the Meir judgment and a

7 charging order, again, very similar to the last provision

8 that we were just talking about, to which the trustee

9 consents, but there would still need to be that charging

10 order that would be in place, and the trustee has agreed that

11 he's consenting with respect to the charging order.  As Your

12 Honor is probably aware, the charging order would be, because

13 these are Delaware LLCs, would have to be obtained under

14 Title 6, Chapter 18, Section 18703; that's the methodology

15 for the creditor to be able to basically execute on the

16 distribution interests out of that LLC.

17          I should also point out in connection with that

18 provision that with respect to the bankruptcy schedules for

19 EZL, there are three claims that are listed.  Those same

20 three claims are listed in the schedules of EAM.  So, this

21 provision, again, only kicks in once all of the allowed

22 claims have been addressed in EAM and, accordingly, the three

23 claims in EZL would have also, by necessity, have been

24 addressed because they are claims against EAM.

25          Your Honor, that's basically the recitation (audio

1  interference) of the stipulation itself.  And perhaps you

2  want to hear from other parties at this point, but I was just

3  going to put Mr. Miller on briefly and ask him a few

4  questions concerning the recitation that I just provided, and

5  he would be available for cross-examination if the Court

6  would so desire.

7          THE COURT:  Okay.  I think -- thank you,

8  Mr. Carroll --  I think it would be appropriate to hear from

9  other parties at this point.  And, of course, you'll have an

10 opportunity to offer Mr. Miller's testimony in support of the

11 relief that she's seeking today.

12         But at this point, I think what I'd like to do is

13 hear from counsel to YH and at that point, then, I think the

14 parties that are supportive of the stipulation would then

15 both be heard and everybody would be able to respond to the

16 collection of comments.  So, I'll hear from counsel for YH

17 Lex.

18         MR. KLESTADT:  Your Honor, good morning.  Tracy

19 Klestadt and Kathleen Aiello of Klestadt Winters Jureller

20 Southard & Stevens, counsel for YH; also, our local counsel,

21 Julia Klein is on the line, as well.  Your Honor entered an

22 order granting permission for us to appear *pro hac vice*.

23         Your Honor, you and I crossed paths while you were

24 in private practice.  I think this may be the first time I

25 have had the privilege of appearing before you.

1          THE COURT:  Well, good morning and welcome.

2          MR. KLESTADT:  Thank you, Your Honor.

3          Your Honor, I have nothing substantive to add to

4   Mr. Carroll's presentation.  I believe he cogently and

5   succinctly presented to Your Honor the terms of the

6   stipulation.

7          I would point out, Your Honor, in terms of the

8   State Court proceeding, that at 2:30 this afternoon, Justice

9   Cohen has scheduled argument on the summary judgment motion.

10  If he does not grant the summary judgment motion, the parties

11  are scheduled to pick a jury tomorrow at 9:30 a.m.  So,

12  unless Your Honor denies approval of the stipulation, the

13  State Court proceeding is on track and will proceed in due

14  course today and tomorrow.

15         Your Honor, it's our position that these

16  bankruptcy filings were engineered as a delay tactic to

17  prevent the State Court trial from going forward.  We believe

18  that there are no legitimate creditors of EZL and EAM.  The

19  creditors that were listed, Your Honor, substantially all of

20  them were paid at the closing of the sale of the property;

21  for example, the mortgage claim and the claim of one

22  contractor were paid.  We believe they were paid in full.

23  And once a claims reconciliation process is undertaken, it

24  will be demonstrated that there are no actual claims of these

25  debtors.

1           I think, Your Honor, the procedure that we've

2   entered into with the trustee sufficiently protects the

3   interests of the estate and does not rush to justice, if you

4   will, a decision with respect to whether or not there are

5   claims against the estate.  We agreed to put proceeds of any

6   recovery into the estate in order to -- in order that any

7   estate interests could be protected, but at the same time,

8   allowing the recovery proceedings, if you will, to go forward

9   in an expeditious manner.

10           We would ask Your Honor to approve the stipulation

11  and, of course, we are available to answer any questions that

12  Your Honor may have.

13           THE COURT:  Thank you, Mr. Klestadt.

14           Before I turn to any parties in opposition, are

15  there any other parties participating today that would be

16  supportive of the stipulation, that wish to be heard?

17       (No verbal response)

18           THE COURT:  Very good.  Then I think I would hear

19  first from counsel for the debtors.  I believe I have both,

20  correspondence, as well as the formal response that was

21  filed, and I would be happy to hear from counsel.

22           I see Ms. Tancredi this morning.  Good morning.

23  Good to see you.

24           MS. TANCREDI:  Good morning, Your Honor.

25           THE COURT:  Good morning.

1        MS. TANCREDI:  It took a while for me to be sure

2   that my mute was off.

3        THE COURT:  No problem.  Thank you.

4        MS. TANCREDI:  Yes, I think it is appropriate to

5   talk a little bit about the background of these cases and

6   what is and what is not before the Court.  I found it helpful

7   to sort of visualize a diagram of the relationship between

8   EAM, EZL, and their interest holders to sort of frame what

9   the parties' arguments are.

10        THE COURT:  Is that the diagram that's on page 4

11   of your response?

12        MS. TANCREDI:  Yes.

13        THE COURT:  Okay.

14        MS. TANCREDI:  Yes, Your Honor.

15        So, yes, so EAM formally owned real property that

16   was located in Southampton.  It was sold for approximately

17   $43 million to an unrelated third party.  After payment of

18   two mortgagees and lienholders, and there was a reserve for a

19   mechanic's lien, the title company distributed net proceeds

20   of sale, $2 million to Mr. Meir and $12.5 million to

21   Ms. Bartolacci and Ermitage.  Ermitage is an entity that is

22   100 percent owned by the Ms. Bartolacci.

23        So, to go back to the structure, so EAM is owned

24   95 percent by EZL and 5 percent by Mr. Meir.  And then EZL's

25   ownership is disputed.  EZL contends that 95 percent of EZL

1  is owned by Ms. Bartolacci, who is Mr. Meir's wife, and 5

2  percent by Mr. Meir.  And YH, which is trying to collect its

3  judgment against Mr. Meir contends that EZL is owned 100

4  percent by Mr. Meir.

5          So, YH wants to claw back about $12.5 million that

6  Ms. Bartolacci and Ermitage received, but YH's problem in the

7  underlying litigation was that it didn't have any claims

8  against EAM, EZL, Ms. Bartolacci, or Ermitage.  So, what they

9  did, in essence, is they built themselves a one-legged tool.

10 They developed a theory that EZL was owned 100 percent by

11 Mr. Meir.

12          And you heard mention of a ruling of Judge Cohen.

13 There is considerable dispute over what Judge Cohen ruled or

14 didn't rule.  That's not before Your Honor, whether it's *res*

15 *judicata* or not.  It has not been briefed or properly

16 presented, so at this moment, I think we all need to conclude

17 for purposes of this hearing that it is, at best, unknown,

18 but because the debtors also filed bankruptcy schedules under

19 penalty of perjury indicating that Mr. Meir only owns 5

20 percent of EZL, that's what is before the Court right now.

21          So, YH's theory is that the sale proceeds did not

22 go from EAM to anybody else, even though EAM was the property

23 owner.  Their theory is that it went right from Mr. Meir to

24 his wife and his wife's entity.  At the time that these --

25 that the closing occurred, YH did not have a judgment against

1  Mr. Meir, has no claims against Ms. Bartolacci or Ermitage,

2  and basically, YH was just ignoring the fact that EAM was the

3  proper recipient of sale proceeds and then made a

4  distribution from there.

5        So, EAM and EZL filed these cases on April 6th,

6  which was less than a month ago.  And immediately after the

7  cases were filed, my colleague Matthew Ward and I reached out

8  to Mr. Miller to bring him up to speed on the various suits

9  that were pending, because there's more suits that just YH's

10  suit; there's also litigation identified in the statement of

11  financial affairs that has been brought by HFZ, which is an

12  entity that formerly employed Mr. Meir.  There is litigation

13  by a surety bond provider (indiscernible) claims against a

14  surety bond that EAM agreed to indemnify under an indemnity

15  agreement.  And there's other litigation that's listed there.

16        So, we sent the trustee the debtor's formation

17  documents, closing documents about how the proceeds of sale

18  were distributed, pleadings.  To the extent that Mr. Meir had

19  bank statements, we sent those.

20        And Mr. Meir, in the meantime, because he is a

21  party to the YH litigation, he removed that suit from State

22  Court and moved to transfer venue to Delaware.  And YH moved

23  to remand and that set up a whole other proceeding in front

24  of New York.

25        Mr. Ward and I asked the trustee whether he was

1  going to take a position, you know, remand, transfer of

2  venue, please let us know what your preference is, and we

3  didn't get any answer.

4         EAM and EZL filed their bankruptcy schedules on

5  April 18th and, again, after they were filed, the debtors

6  asked the trustee what his position would be on the motion to

7  remand and the trustee didn't tell us directly; instead, what

8  we received was, the night before the hearing on the motion

9  to remand, we received a copy of the stipulation from

10  Ms. Bartolacci's counsel that had been filed in the New York

11  case.  So, three weeks into the case, before the 341 meeting

12  was held, before the trustee had spoken with Mr. Meir, the

13  trustee signed a stipulation.

14         And I think Mr. Carroll summarized many provisions

15  of the stipulation, but at least in the copy that I pulled

16  off the docket, I didn't see that it was actually attached to

17  their motion to approve.  So, it is like 8 pages long;

18  hopefully, Your Honor has it.

19         THE COURT:  I have it and I have it as Exhibit 1

20  to the motion.  I think it was with the motion when I

21  received it.  If there's a snafu on CM/ECF, hopefully, we

22  can -- hopefully, everybody has the stip, so I think we can

23  move forward.

24         MS. TANCREDI:  Yeah, I assumed Your Honor had it

25  and if it's a problem on my mind, I just want to be sure.

1          THE COURT:  No problem.

2          MS. TANCREDI:  So, yes, so, at the end of the day,

3  what the parties contemplate is that the trustee would turn

4  over a surplus to YH.  But these are surplus cases;

5  otherwise, YH would never agree to enter into this

6  stipulation.  It would not bear the risks of this litigation

7  and costs without having some ability to recover on the other

8  end.

9          And it's the turnover of the surplus, in

10 particular, that is extremely prejudicial to the rights of

11 EAM, because the cause of action belongs to EAM.  And then

12 once EAM's creditors are paid --

13          THE COURT:  But that -- right, but I just want to

14 make sure I understand.  I mean, you folks filed a 7, not

15 an 11 --

16          MS. TANCREDI:  Uh-huh.

17          THE COURT:  -- which leads to the appointment of

18 Mr. Miller as the trustee, vested with all the authority of a

19 trustee.  So, when we talk about those proceeds belong to

20 EAM, it is -- those are proceeds or assets, if any, that

21 would be under his control or authority.

22          And I think, is your concern that he's exceeded

23 his authority or he's made a deal that's unwise or

24 unfavorable?

25          MS. TANCREDI:  Well, it's a little bit of both.

1          THE COURT:  Okay.

2          MS. TANCREDI:  It's not just prejudicial to EAM.

3   It's also prejudicial to the rights of EZL, because if EAM's

4   creditors are paid in full, then EAM would make a

5   distribution to EZL, if EAM determined that it

6   (indiscernible) would then make a distribution, and that

7   distribution would be payable to EZL's members.  And so,

8   obviously, this is prejudicial to the rights of the members

9   of EZL.

10         And as Your Honor has said -- or asked, it does

11  exceed what the trustee is allowed to do or not do.  Under

12  Section 726 of the Bankruptcy Code, it's very, very clear and

13  the case are clear that a surplus is to be returned to the

14  debtor and that's period, full stop.  The Bankruptcy Code

15  says nothing about the trustee making a distribution to the

16  debtor's members, entering into a charging order, or having

17  any authority after that point.  So, that's one way in which

18  the stipulation exceeds the power of Mr. Miller.

19         But I think to get to sort of the prejudice here,

20  I think it's important, again, to consider the context of

21  this.  The debtor's 341 meeting was scheduled for April 28th.

22  On April 27th, Mr. Meir contacted his counsel -- contacted us

23  on behalf of the debtor and advised that he was ill and did

24  not think that he would be able to testify at the April 28th

25  meeting.  So, I advised the Trustee's Office that we had

1    heard this from the debtor's representative and we asked the

2    trustee if he could assist us with rescheduling the meeting

3    and the trustee said the meeting would go forward, okay.

4              Mr. Meir provided a doctor's note from his

5    internal medicine physician, which I forwarded to the trustee

6    and the trustee insisted that the meeting would go forward,

7    even though the debtor's representative would not be there.

8    So, on April 28th, Mr. Miller proceeded with the meeting over

9    my objection and I don't know what he conducted and I don't

10   know the extent to which it's relevant to this proceeding,

11   but it was not a 341 meeting, because the debtor's

12   representative was not present.  There was no one under oath.

13   The trustee basically read the debtor's schedules and then

14   there were various speeches made by counsel for YH and the

15   trustee, and this went on for about an hour.

16             And at the end of this exercise, the trustee did

17   not give notice of a rescheduled or continued 341 meeting

18   date.  And then to my surprise on Saturday, the trustee filed

19   minutes with the Court stating that the 341 meeting had been

20   concluded when, in fact, no 341 meeting had ever occurred.

21             And the statutory purpose of a 341 meeting is to

22   examine the debtor under oath, and the debtor's participation

23   in a 341 meeting is not optional.  In Section 343 of the

24   Bankruptcy Code, it says that the debtor shall appear and

25   submit to examination.  Section 341(d) of the Bankruptcy Code

1  says that the trustee shall orally examine the debtor.  And

2  Bankruptcy Rule 2003(b)(1) says that the business of the

3  meeting shall include the examination of the debtor under

4  oath.

5         The debtor (sic) can't skirt the requirement that

6  he examined the debtor under oath.  And there's only one

7  circumstance in the Bankruptcy Code where a debtor is not

8  required to testify and that's under Section 360 -- I'm

9  sorry -- 341(e), where a Chapter 11 debtor has filed its plan

10 and has solicited acceptances prior to the case.  So, that's

11 clearly not this case.

12        And then there are various cases excusing a debtor

13 from participating, but those are decided under

14 Section 105 --

15        THE COURT:  Well, the matter that I want to make

16 sure that we're talking -- I mean, if this is to demonstrate

17 that perhaps, as I think you put in your papers, Mr. Miller

18 is rushing to a deal, I get that.  I'm not being asked today

19 to accord any relief or reschedule or reset a 341 at this

20 point, anyway, and I have not seen minutes that were, I

21 guess, filed on Saturday.  I did not review the docket, other

22 than to see the agenda and your objections that that were

23 filed.

24        You're not asking me to reopen a 341 today, right?

25        MS. TANCREDI:  No, I'm not asking for that, but I

1   am anticipating, based upon some correspondence that I

2   received, that there may be an attempt to establish some sort

3   of effect of a 341 meeting having or not having occurred or

4   being concluded.  So, I just wanted to get out there that our

5   position is there wasn't a 341 meeting and it certainly

6   didn't conclude.

7           THE COURT:  So noted.

8           MS. TANCREDI:  Thank you.

9           So, the trustee has the burden of proof to show

10  that the stipulation should be approved.  He has to show that

11  it's fair and equitable.  He has to show that it doesn't

12  exceed his powers under the Bankruptcy Code and last, but not

13  least, the stipulation can't deny the debtors and their

14  members of their constitutional property rights.

15          And so, for reasons that we have already stated,

16  there's nothing fair or equitable about the stipulation.  The

17  stipulation also exceeds the trustee's powers.  I had

18  mentioned before that Section 726(a)(6) mandates that any

19  surplus must be returned to the debtor and that this is not

20  negotiable.

21          The trustee's mandate just does not stop

22  administering Chapter 7 cases for the benefit of creditors.

23  I know that's probably 90 percent or more of the cases that

24  Mr. Miller sees, but these are surplus cases and it is

25  fundamental, it's even in the U.S. Trustee's handbook, that a

1   surplus case creates a fiduciary duty of a trustee to the

2   debtor and its members.  So, Mr. Miller does owe a fiduciary

3   duty to EAM, EZL, Mr. Meir, and Ms. Bartolacci.

4          As Mr. Carroll mentioned, these debtors are

5   limited liability companies and under the Bax decision, YH

6   does not have standing to pursue derivative actions on behalf

7   of the LLC.  And as mentioned in our papers, EAM, EZL,

8   Mr. Meir, and Ms. Bartolacci have constitutional property

9   rights, and so the extent to which they have a right in

10  property has to be determined by an adversary proceeding.

11  The reason it has to be determined by an adversary proceeding

12  is because it's required under Rule 4001.  And adversary

13  proceedings are designed with extra procedural protections

14  that are simply not present in contested matters and

15  certainly not contested matters on shortened noticed.

16          THE COURT:  So, I think I want to understand --

17  and, Ms. Tancredi, what I may do is ask, perhaps, Mr. Carroll

18  to weigh in, in response -- and I'm not interrupting your

19  presentation.  I will return to you.  But I want an answer on

20  this question.

21          As I read the stipulation, and particularly

22  Section 8 of the stipulation, which I think you're focused

23  on, which is the distribution of proceeds or distribution of

24  surplus, your point would be if there's a surplus, that's

25  ours.  The trustee has agreed that any surplus could go over

1   to YH, but I think Mr. Carroll was pretty precise in saying

2   that that is not happening under this order; as a matter of

3   fact, the order, the stipulation is extremely clear that any

4   money would go to be held by the trustee and presumably

5   disbursed by an order of this Court.

6          Now, your point might be, I don't like the fact

7   that the trustee has agreed to not argue about this, but I am

8   not certain that it is providing for that distribution, or

9   otherwise, today, precluding you from interposing an

10  objection or otherwise being heard, because that money is

11  coming into the estate for distribution under Mr. Miller's

12  powers and this Court's authority.

13         Mr. Carroll, I think I would like -- I have spoken

14  for a while, but I think you get my drift -- I would like an

15  understanding of your perception.  And it may be appropriate

16  to hear from Mr. Klestadt, as well, so that everybody is at

17  least on the same page for purposes of today as to what the

18  stipulation accomplishes and what it is not necessarily doing

19  today.  I hope I have been clear.

20         Mr. Carroll, I would like your thoughts.

21         MR. CARROLL:  Yes, Your Honor.  I think you have

22  been clear and I think you've clearly stated that there would

23  be have to be basically a charging order in a proceeding to

24  obtain that charging order.

25         To make an analogy and to address the issues

1  concerning the distribution of surplus to a debtor, I've

2  encountered a number of situations where you may have an

3  attachment of funds that would have otherwise been returnable

4  to the debtor.  The trustee would be bound by that attachment

5  order to disburse to that particular party, instead of to the

6  debtor.

7          That's really the exact same thing that happens

8  here, with respect to a charging order that gets put in place

9  for distributions.  And there's going to be -- there would

10 have to be a Chancery Court proceeding, quite frankly, to

11 obtain that charging order.

12         The only thing we've done is indicated that the

13 trustee is not going to oppose that proceeding.  Other

14 parties would have the ability to oppose that proceeding.

15         THE COURT:  Thank you, Mr. Carroll.

16         Mr. Klestadt, I think I offered you the

17 opportunity to weigh in on that precise point and then we'll

18 return to Ms. Tancredi.  I'd like your thoughts.

19         MR. KLESTADT:  Yes, Your Honor.  Thank you.

20         Your Honor, I think it would be helpful, if I may

21 read to you a quote from Justice Cohen on the January 31st

22 hearing on the issue of ownership of EZL and EAM.  On

23 January 31st -- and this is on the transcript at page 124,

24 line 22, to page 125, line 13, Justice Cohen said, quote:

25              "Number one, it is clear to me that Mr. Meir is

1   judicially *estopped* and equitably *estopped* from denying 100

2   percent ownership.  He made representations to this Court.

3   He made representations to another Court, both of which led

4   to, in part, favorable rulings in reliance on statements

5   about his 100 percent ownership.  So, from Mr. Meir's

6   perspective, who is a party in this case and is clearly

7   subject to this Court's jurisdiction, he may not disclaim

8   ownership.

9          So it leaves the question of Ms. Bartolacci's

10  rights.  I'm going to make that finding that Mr. Meir is

11  judicially *estopped* and equitably *estopped*.  I'm not going to

12  issue a turnover order yet because I think that procedurally

13  and from an efficiency perspective, the better way to do

14  this, in part -- this part, is, in fact, to convert it to

15  a 5225(b) proceeding to give Ms. Bartolacci a chance to make

16  whatever argument she wants to make.

17         Again, my comments about the evidence being

18  overwhelming are based on the record I have in front of me."

19         So, Your Honor, I think the point is that Mr. Meir

20  is *estopped* from making any arguments that he is entitled to

21  the surplus.  Other parties, such as Ms. Bartolacci, may have

22  such arguments.

23         But I agree with the trustee that we have to come

24  back to Your Honor to impose a charging order.  No money is

25  going to leave the trustee's hands, except upon order of the

1  Court.  That's what we agreed to and that's what the trustee

2  has agreed to.

3            THE COURT:  Thank you, Mr. Klestadt.

4            Ms. Tancredi, you may proceed.  I would note that

5  I do not have the transcript from which Mr. Klestadt read.  I

6  understand, Ms. Tancredi, your point at the outset that, you

7  know, how you side disputes the significance or consequences

8  of rulings that have been made in the New York Court.

9            I don't want any uncertainty about it.  I am not

10  ruling or commenting or otherwise weighing in.  I have a

11  stipulation in front of me.  That stipulation references

12  legal proceedings that are pending in another court, but I am

13  not being asked today, I think, to make findings as to what

14  was ruled or who was collaterally *estopped* at this point.

15            My question, which I interposed to Mr. Carroll and

16  to Mr. Klestadt, I think has been answered, that suggests

17  that further proceedings in this Court would be required

18  before a distribution of the surplus and I think both of the

19  counsel have confirmed that that's the case.  And, again, I

20  understand that there are issues and disagreements both,

21  about the status of the New York litigation and what may

22  happen in the future, but I think it was important to get a

23  little bit of clarity on that, and for that, I appreciate

24  counsel's input.

25            But I did interrupt you and you may proceed.

1           MS. TANCREDI:  Yes, Your Honor.

2           And I appreciate the interruption and the

3  clarification because the way I read the stipulation, the

4  stipulation is the charging order.  I think it was very

5  carefully drafted and I don't think it was carefully drafted

6  to be clear.  I think it was carefully drafted to be

7  ambiguous.

8           You know, paragraph 8 is titled "Charging Order"

9  and if you read the last, you know, the operative phrase:

10          Then the trustee shall make the -- the trustee

11  shall make the distribution directly to YH as a party in

12  interest, recognizing YH as the sole economic interest holder

13  of EZL's interests in EAM, pursuant to, and to the extent of

14  the Meir judgment in a charging order to which the trustee

15  consents herein.

16          THE COURT:  Well, to the extent, I don't

17  necessarily disagree with that and to the extent that I was

18  unclear on it, that's why I asked my question.  And I think,

19  again, I got a consistent response from both parties to the

20  stipulation about what its effect today is and the

21  expectation that there would be further proceedings in this

22  court or otherwise.  So, I appreciate that clarity.

23          MS. TANCREDI:  Thank you.  So, I'm not going to

24  rehash the rest of our arguments.  Again, I would like to

25  focus on the fact that these are surplus cases and so the

1  trustee has a fiduciary duty to the debtors and their

2  members, whoever those members may be.

3         And with respect to Ms. Bartolacci, he's wholly

4  abdicated that fiduciary duty.

5         THE COURT:  Okay.

6         MS. TANCREDI:  Thank you, Your Honor.

7         THE COURT:  Sure.  Thank you, Ms. Tancredi.

8         I believe that I have received correspondence from

9  counsel for Ms. Bartolacci, dated the 26th, and I'm not sure

10 if counsel is on.

11        Is that Mr. Scherling?

12        MR. SCHERLING:  No, Your Honor; I'm counsel to the

13 trustee, as well.

14        THE COURT:  Oh, okay.

15        All right.  Is there anyone today representing

16 Ms. Bartolacci in connection with today's proceedings?

17        MS. MALIK:  Yes, Your Honor, good morning.

18        This is Pankaj Malik from YK Law, LLP.  My local

19 counsel, my clients, are still in the process of officially

20 retaining local counsel --

21        THE COURT:  No worries at all.

22        MS. MALIK:  -- so my (indiscernible) --

23        THE COURT:  No worries at all.  I'm happy to hear

24 you.  I think I have been pretty consistent throughout my

25 career that, obviously, we take the affiliation with local

1  counsel seriously, but we also acknowledge the timing and

2  issues.  I am more than happy to hear you today and we're not

3  going to sweat anything about local counsel.  I would

4  appreciate your input in today's hearing and I appreciate you

5  coming.

6           MS. MALIK:  Thank you so much, Your Honor.

7           So, Your Honor, I have been representing the

8  interests of Ranee Bartolacci and Ermitage One, LLC in the

9  state court, in the U.S. Southern District Bankruptcy Court

10 of New York in these proceedings since about March 11th or

11 March 12th.  My client became a named party in this

12 proceeding in February of this year.

13          All of this talk about this prior proceeding where

14 Mr. Meir was estopped from claiming anything regarding his

15 ownership of EAM or EZL, they were all against only Mr. Nir

16 Meir.  My clients were not named parties in that action,

17 which is why, if you recall the portion of the transcript

18 that Mr. Klestadt was citing from, the Court said it was

19 going to be a conversion; however, he goes on to say that in

20 order to preserve or provide Ms. Bartolacci the opportunity

21 to exercise her due process rights.  There would have to be a

22 proceeding commenced against her.  She was not a party to the

23 action; she had no notice of all of this that was going on.

24 Her only connection to the prior proceeding against Mr. Meir

25 was the fact that a subpoena was served on her and that was

1   it.  Now, since March, we have been in a defensive position

2   for the first time.

3           And I just want to -- Ms. Tancredi, I'm not going

4   to duplicate or, you know, reiterate the arguments that she's

5   made; however, to the extent that the background touches upon

6   my clients, I'd just like to expand on that, if I may.

7           It is our contention that Bartolacci is the 95-

8   percent member of debtor EZL 40 Meadow Lane and EZL, in turn,

9   is the 95-percent member of debtor EAM 40 Meadow Lane.

10  Bartolacci is also the 100-percent member of Ermitage One,

11  LLC.  And Bartolacci and Ermitage are both parties in

12  interest in this matter.

13          In 2013, on Bartolacci's 38th birthday, Mr. Meir,

14  her husband, took her to see the property at 40 Meadow Lane

15  and presented it to her as to be their future marital home.

16  The property was purchased for $10 million and it was a

17  demolish and knock-down.  Over the ensuing, the following

18  three years, a brand new home was constructed on that

19  property.  Ms. Bartolacci contributed for over the period

20  from the purchase of the property, through the construction,

21  maintenance, and the eight years until it was sold,

22  approximately $5 million of her own separate monies to the

23  appreciation and completion of that property.

24          Ultimately, in April of 2021, the property was

25  sold for $43 million.  It was not until two months after that

1   that YH Lex obtained a judgment against her husband, Nir

2   Meir.  My client never had any connection with YH Lex or

3   their claims against her husband.

4           We appeared, we filed answers, we filed pleadings,

5   and then, when the debtors filed for bankruptcy at the remand

6   hearing before Judge Garrity in Southern District Bankruptcy

7   Court of New York, the eve before that hearing, this

8   stipulation was filed on the New York State case's docket.

9   And, when I reviewed it, it raised a lot of troubling

10  concerns for the interests and the rights of my clients.  We

11  are here defending our interest and our ownership interest in

12  the proceeds that were distributed to her.  And the

13  stipulation provides, amongst other things, that the trustee

14  consented to the remand, that any proceeds or recovery would

15  be paid over to the bankruptcy estate of EAM for distribution

16  in accordance with Section 726 of the bankruptcy code.  The

17  trustee would consent to YH Lex being granted a claim

18  pursuant to 11 U.S.C. 503(b) for substantial contribution

19  with priority -- giving YH Lex a priority ahead of allowed

20  claims of general unsecured creditors.  The trustee would

21  confer YH Lex standing to prosecute claim objections to the

22  extent that the trustee declined to prosecute any claim

23  objection directly.

24          And then, following distribution to EAM's

25  creditors, the trustee would distribute the balance directly

1   to YH Lex as a party in interest, recognizing YH Lex as the

2   sole economic interest holder of EZL's interest in EAM.

3            So the stipulation highlights and acknowledges

4   three vital points.  First, any fraudulent conveyance causes

5   of action, including the claims asserted in the turnover

6   action, solely belong to EAM's Chapter 7 estate; second, YH

7   Lex expects there to be a surplus after EAM's creditors are

8   paid in full; and, third, the stipulation is of course

9   conditioned upon the approval of the bankruptcy code.

10            Based upon all of the arguments made by Ms.

11   Tancredi, I urge this Court to deny this application and

12   disapprove the stipulation.

13            You know, Bartolacci owns 95 percent of EZL --

14   before I go into that, I just want to address one point that

15   both Mr. Carroll and Mr. Klestadt focused on is that the

16   reason that this is being prosecuted and filed and pushed

17   through the court on an expedited basis is the fear of the

18   dissipation of assets.  This property, Your Honor, was not

19   sold two weeks ago, it was sold a year ago.  To the extent

20   that there are any assets remaining, to now rush through and

21   steamroll over my client's interests in EZL and interest in

22   the proceeds that she received from the sale of her marital

23   home is very, highly prejudicial to Bartolacci and Ermitage's

24   interests in these proceedings.

25            THE COURT:  Can I ask you a question?  And --

1        MS. MALIK:  Yes, Your Honor.

2        THE COURT:  -- I'll give Ms. Tancredi an

3   opportunity to respond to the same question after you

4   conclude.  What significance, if any, should I attribute to

5   Judge Garrity's decision to remand this back to the state

6   court rather than, say, transferring venue or holding the

7   matter subject to the stay and for further proceedings?

8        I presume that some of these arguments were made

9   to Judge Garrity in one form or another and he entered the

10  order that said back to state court you go; not to Delaware,

11  not to stay here or anything else.  Is there any significance

12  I should attribute to that decision?

13       MS. MALIK:  Well, Your Honor, I am not going to

14  presume what Judge Garrity considered before he issued or

15  rendered his order; however, these arguments were presented

16  to Judge Garrity and, on the date of the hearing, Mr. Carroll

17  advised Judge Garrity that they would be filing a motion to

18  approve the stipulation that afternoon and that they would be

19  filing a motion that they expected to have a hearing on in

20  the next three or four days.

21       The stipulation and motion were not filed until a

22  few days later, it was not filed that afternoon, and I

23  believe that the Judge felt that it would be before Your

24  Honor before the trial would occur before Justice Cohen based

25  upon what Mr. Carroll recommended.  Now, we've got this

1  situation where my clients are completely bootstrapped

2  because we're preparing for arguments on summary judgment

3  this afternoon, we're preparing for a jury trial this

4  morning, and then we have this hearing that really should

5  have occurred last week.  And if at that time Your Honor had

6  chosen to disapprove the stipulation, this special proceeding

7  would be stayed so that there can be a due process hearing in

8  this court, which is really what needs to happen before a

9  determination is made as to whose funds these really are.

10            As far as the fiduciary duty and the due process

11  taking-up-private-property arguments, I would reiterate all

12  the arguments made so ably by Ms. Tancredi on the record.

13            THE COURT:  Okay.  Thank you, Ms. Malik.

14            Ms. Tancredi, I think I said I would give you the

15  same opportunity to respond.  Ms. Malik did respond to the

16  question and it gave me a little bit more procedural context

17  for Judge Garrity's proceeding, but you're welcome to

18  respond, and then I'll hear from Mr. Carroll and Mr. Klestadt

19  in response.

20            MS. TANCREDI:  So, similar to Ms. Malik, I

21  wouldn't presume to say why Judge Garrity ruled as he ruled,

22  and I was also not a party to that hearing --

23            THE COURT:  Okay.

24            MS. TANCREDI:  -- I was not in attendance.

25            THE COURT:  Okay.

1    MS. TANCREDI:  However, I would observe that his

2  ruling does -- I guess, if I'm sitting in his shoes, it does

3  the least amount possible and sort of leaves the decision in

4  your hands.  It is a very effective, I guess, punt of the

5  issue so that, you know, when the hearing is before you, you

6  can decide.  So I wouldn't attribute personally any

7  significance to it.

8    THE COURT:  Okay.  All right, thank you.

9    Mr. Carroll, I think what would make sense right

10  now, you had proposed to present Mr. Miller for some

11  testimony.  I assume you have no other witnesses.  The

12  stipulation is already in the record as an exhibit to your

13  motion, but other than I just want to make sure.  Are there

14  any other parties that expect to call witnesses in connection

15  with this proceeding?

16    (No verbal response)

17    THE COURT:  Okay, so Mr. Miller would be the only

18  witness.  And, Mr. Carroll, if you wish to proceed, you may.

19    MR. CARROLL:  Thank you, Your Honor.  Before I do

20  that, I just want to make a comment on a few of the

21  statements that were made --

22    THE COURT:  I think -- I thought about that for a

23  second -- I think we're probably better off hearing Mr.

24  Miller.

25    MR. CARROLL:  That's fine, Your Honor.

1          THE COURT:  And then I'll give you certainly an

2   opportunity and some leeway in connection with any kind of

3   closing arguments to tie it together.  You know, I don't need

4   the full stem-winders from everybody, but I do --

5   procedurally, where we are, I heard from everybody in terms

6   of what I think I would treat as openings, we'll get to the

7   substance of the matter, and then any further argument people

8   have to make I would be happy to entertain, including yours.

9          So, with that, Mr. Carroll, you may proceed.

10          MR. CARROLL:  With that, Your Honor, I would call

11  Mr. George Miller in support of the motion.

12          THE COURT:  All right.  Can we swear the witness,

13  please?

14          THE CLERK:  Raise your right hand.  Do you

15  solemnly swear to tell the truth, the whole truth, and

16  nothing but the truth, so help you God?

17       (No verbal response)

18          THE CLERK:  You're mute is on.

19          THE COURT:  The record reflects Mr. Miller said

20  yes.

21          Mr. Miller, you do need to un-mute.

22          THE WITNESS:  There I go.

23          THE COURT:  There we go.

24          THE WITNESS:  Now I'm good.  I was muted before

25  and un-muted.  I do.

1          GEORGE L. MILLER, WITNESS, SWORN

2          THE CLERK:  Okay.  Please state your name for the

3    record and spell it.

4          THE WITNESS:  George L. Miller, G-e-o-r-g-e L. M-

5    i-l-l-e-r.

6          THE COURT:  Good morning, Mr. Miller.

7          Mr. Carroll, you may proceed.

8          THE WITNESS:  Good morning, Your Honor.

9                    DIRECT EXAMINATION

10   BY MR. CARROLL:

11   Q    Mr. Miller, can you please (indiscernible) --

12         THE COURT:  Hang on.  Mr. Carroll, when you turn,

13   your microphone is not picking you up.

14         MR. CARROLL:  Can you hear me now.

15         THE WITNESS:  Oh, he's gone.

16         THE COURT:  Mr. Carroll, did we lose you?

17      (No verbal response)

18         THE COURT:  All right, I'll tell you what we're

19   going to do.  We're going to take just a five-minute break.

20   He may have gotten disconnected and we'll reconvene.

21         Mr. Miller, you remain under oath and, hopefully,

22   we'll get back together in five minutes.

23         I appreciate everyone's patience.  Thank you,

24   Counsel.

25      (Recess taken at 10:53 a.m.)

1          (Proceedings resumed at 10:59 a.m.)

2               THE COURT:  Good afternoon, all -- or good morning

3    again.  This is Judge Shannon.

4               Can I get a thumbs-up that everybody is able to

5    hear me?

6               Great.  And I do see Mr. Carroll.  Welcome back,

7    sir.

8               MR. CARROLL:  Your Honor, I don't know where I

9    went, into the netherworld somewhere.  I'm back.  Thank you.

10               THE COURT:  All right.  Mr. Miller, I would remind

11   you, sir, that you remain under oath, and I think we were

12   just about to commence the examination.

13               THE WITNESS:  Yes, Your Honor.

14   BY MR. CARROLL:

15   Q    Mr. Miller, you've been appointed as the Chapter 7

16   trustee for the estates of EAM 40 Meadow Lane LLC, and also

17   EZL 40 Meadow Lane LLC; is that correct?

18   A    That is correct.

19   Q    And do you have a copy of the motion of the Chapter 7

20   trustee for an order approving the stipulation between

21   yourself as Chapter 7 trustee and YH Lex Estates LLC pursuant

22   to Rule 9019, which is Docket Item 21; and the subject

23   stipulation, which was Exhibit 1, which is Documents 21-2; do

24   you have that before you?

25   A    I do.

1  Q     And did you execute that stipulation with YH in your
2  capacity as trustee?
3  A     I did.
4  Q     And were you on the Zoom hearing today when I recited
5  the background in terms of the stipulation?
6  A     I was -- or I am.
7  Q     And did I accurately recite the terms and your
8  understanding of the terms of the stipulation?
9  A     Yes, I do.
10 Q     Okay.  And what, in the exercise of your business
11 judgment, is the benefit to the estates in entering into this
12 stipulation?
13 A     All the money that's collected by -- in the New York
14 litigation would become property of the estate, you know, and
15 as soon as it's collected.
16 Q     Okay.  And you heard reference in the earlier
17 discussions to concerns about dissipation of assets.
18 A     Yes.
19 Q     Is that a concern that you had in connection with these
20 estates?
21 A     Always in a bankruptcy, especially when something has
22 been sold and it's in cash.  Cash is easy to, I'm going to
23 say, spend, and there's problems and other matters.  So,
24 based on my experience, the quicker you can get a judgment
25 and collect the money, the better it is for the estate.

1  Q     And, in the exercise of your business judgment, do you

2  believe that the stipulation is in the best interests of

3  these estates?

4  A     Absolutely.  I collect money and I give very little.

5  Q     Have you conducted at any 341 meeting in connection

6  with this case?

7  A     I did.

8  Q     Okay.  And I believe you heard reference to the fact

9  that a representative of the debtor did not appear at the 341

10  meeting?

11  A     Yeah, the day before, I got notice that the

12  representative was not coming to the thing.  And I received

13  an email from the cosmetic surgeon that he would not be able

14  to make it.

15  Q     Okay.  And, in terms of conducting the 341 meeting, you

16  agreed that you would reschedule with respect to the

17  testimony of the debtor representative --

18  A     Yes.

19  Q     -- another date?

20  A     Yes.  I concluded the 341 meeting, but I also put on

21  the record that, you know, I will conduct an examination of

22  Mr. Meir, who was presented as the debtors' representative.

23  Q     And at that 341 meeting, I believe you outlined what

24  information you had managed to garner thus far concerning

25  these debtors' estates; is that right?

1  A    Yes.  In addition to the schedules, there was a lot of

2  information and research that I had done, and I had said to

3  the attendees what my investigation has incurred, what I

4  believed were the assets.  I read into the record the

5  schedules and the liabilities.  The attendees were primarily

6  the debtors' counsel and representatives of YH Lex.  I don't

7  believe there was any other creditors at the meeting.

8           MR. CARROLL:  I have no other questions, Your

9  Honor.

10          THE COURT:  All right.  Ms. Tancredi, would you

11  like to cross-examine?

12          MS. TANCREDI:  Yes.  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14  BY MS. TANCREDI:

15  Q    Mr. Miller, I'm Lisa Tancredi from Womble Bond

16  Dickinson and I represent the debtors.

17      I believe that you testified that there was not a

18  debtor present -- debtor representative present at the 341

19  meeting; is that correct?

20  A    Correct.

21  Q    Did you ever examine Mr. Meir under oath?

22  A    No.

23  Q    Have you ever spoken with Mr. Meir?

24  A    No.

25  Q    Have you ever spoken with Ms. Bartolacci?

1  A     No.

2  Q     Did you receive copies of the debtors' operating

3  agreements from the debtors' counsel?

4  A     I did.

5  Q     Did you read them?

6  A     I did.

7  Q     And, as part of your investigation, did you note that

8  the operating agreement for EZL reflected that EZL is owned

9  95 percent by Ranee Bartolacci?

10  A    I think the document speaks for itself, you'd have to

11  show me.  I don't recall what it is right now.

12  Q     But you did read it?

13  A    There is a dispute between the operating agreement and

14  what the Court says and I'm not getting involved in all that

15  at this time.

16  Q     Okay.  And as part of your investigation did you note

17  that the operating agreement for EAM reflects that EAM is

18  owned 95 percent by EZL and five percent by Mr. Meir?

19  A    The document speaks for itself, I don't have it in

20  front of me.

21  Q     Did you review the docket of the litigation with YH and

22  Mr. Meir and Ms. Bartolacci and Ermitage?

23              THE COURT:  Hang on --

24              THE WITNESS:  Which docket?

25              THE COURT:  -- hang on just a second.  This is

1  Judge Shannon.  I want to make sure I understand the

2  question.  Are you asking if he reviewed the docket because I

3  think your question was phrased, did you review the docket of

4  the litigation with Mr. Meir or Ms. Bartolacci, et cetera.  I

5  think -- so I'm not sure if you're asking if he's familiar

6  with the docket or whether or not he met with counsel for

7  litigants and went over the docket.

8          I'm not sure if I'm being clear, but I want to

9  make sure I understand what your question was.  Sorry.

10          MS. TANCREDI:  My question was intended to be

11  simple.  My question was had he actually just reviewed the

12  docket himself of the litigation between YH, Mr. Meir, Ms.

13  Bartolacci, and Ermitage.

14          THE WITNESS:  I did not review the docket, I

15  reviewed the information that was provided by your firm and

16  by Mr. Klestadt's firm, and I read trial transcripts and

17  depositions and things of that nature.

18  BY MS. TANCREDI:

19  Q    And are you aware that neither EAM nor EZL are parties

20  to that litigation?

21  A    I believe that's correct, but it is the assets of EAM

22  and EZL that are at risk and to be collected by a third

23  party, and that's why the stipulation gives the assets to me.

24          MS. TANCREDI:  Your Honor, I move to strike the

25  latter part of that testimony, it wasn't responsive; it was a

1  yes-or-no question.

2         THE COURT:  No, I'm going to allow it.  If you

3  want to expand on his understanding of the effect of the

4  stipulation, that's fine, but I think his comment, his

5  concluding comment was his understanding of what the

6  stipulation does.

7         So, I'll allow it, but, again, I'll give you

8  certainly latitude to cross him further.

9         MS. TANCREDI:  Thank you.

10 BY MS. TANCREDI:

11 Q    Mr. Miller, you made a comment that you received a

12 doctor's note from a cosmetic surgeon; is that correct?

13 A    That's correct.

14 Q    And isn't it correct that I have pointed out to you

15 that Dr. Shapiro, who wrote that note, was actually an

16 internal medical doctor?

17 A    You sent me an email with no supporting documentation.

18 My research all indicated he was a cosmetic surgeon in

19 Florida.

20 Q    My email had a link to his website that showed that he

21 was an internal medical doctor, did it not?

22 A    I didn't see internal medical doctor, I saw cosmetic

23 surgery.  I did not see internal medical doctor, I saw

24 cosmetic surgery.  I didn't look at the link, I relied on

25 what my -- you know, what I found in my own --

1  Q     So you didn't read the entire website?

2  A     Did I read the entire website?  No --

3  Q     No.

4  A     -- because I don't know how long it was.  It might have

5  been like some little comment at the bottom or something, but

6  primarily it's a cosmetic surgery.

7  Q     Mr. Miller, it was an entire page and I sent you the

8  link to it.

9  A     Okay.

10 Q     And I'm surprised you didn't read.

11 A     Well, it was a cosmetic --

12 Q     Did you review --

13 A     -- surgery company.

14 Q     Did you review the debtors' schedules and statement of

15 financial affairs

16 A     I did.

17 Q     And do you recall that in EZL's statement of financial

18 affairs in response to Item 28 the debtor indicated that Nir

19 Meir has only a five-percent interest in EZL?

20 A     I don't know if it's 28, but I recall that, that he has

21 a five-percent interest.

22 Q     And are you familiar with the Bax decision?

23 A     The what decision?

24 Q     The Bax decision.

25 A     No.

1  Q     Based upon your investigation, is YH a member of the

2  debtors?

3  A     No.

4            MS. TANCREDI:  I don't have any further questions

5  of this witness.

6            THE COURT:  All right.  Ms. Malik, did you wish to

7  ask any questions?

8            MS. MALIK:  Yes, very briefly, Your Honor.

9            THE COURT:  Of course.

10                       CROSS-EXAMINATION

11  BY MS. MALIK:

12  Q     Good morning, Mr. Miller.  I'm Pankaj Malik; I'm the

13  attorney for the parties in interest Ranee Bartolacci and

14  Ermitage One, LLC.

15        Do you acknowledge that EZL is 95 percent -- is the 95-

16  percent member of EAM?

17  A     Well, that's what the bankruptcy schedules and

18  operating statements say.

19  Q     And do you acknowledge the claims of Ranee Bartolacci

20  that she is 95-percent member of EZL?

21  A     EZL.  I don't think she is of EZL.  No, no -- yeah, of

22  EZL.  I'm confused between EZL and EAM.  I'm sorry, EZL.

23  Q     No problem.

24  A     That's what the operating statements are for EZL.

25  Q     And do you acknowledge those claims of Ranee

1  Bartolacci?

2  A    They're not claims, they're equity security interests.

3  Q    Okay.  And do you agree that you anticipate that there

4  would be a surplus in this Chapter 7 proceeding?

5  A    I do not.

6  Q    And do you agree that as Chapter 7 trustee for EAM and

7  EZL you owe the debtor and their members a fiduciary duty?

8  A    I do and it's protected.

9  Q    And do you acknowledge as Chapter 7 trustee of EAM and

10  EZL you have the right to intervene in the proceeding by YH

11  Lex against Bartolacci and Ermitage?

12  A    Yes, because they're assets of the debtor.

13  Q    And do you acknowledge that these bankruptcy

14  proceedings are core proceedings and related to the special

15  proceeding commenced by YH Lex?

16  A    I don't know if it is or not, I'm not a lawyer.

17  Q    And when you were involved in the negotiations of the

18  stipulation with YH Lex, did you discuss the stipulation or

19  its contents with Bartolacci or her counsel?

20  A    Me personally, no, it was all done through counsel.

21  Q    Did your counsel discuss it with my office?

22  A    I'm not sure.  I know it was discussed -- I don't know

23  -- with your office, no, but it was discussed with some

24  lawyer who says he's representing everybody on the member --

25  the member area.

1  Q     Well, isn't it true that your counsel only discussed

2  the stipulation with counsel for YH Lex?

3  A     No.

4  Q     Isn't it true that the proceeds from the sale of the

5  property at 40 Meadow Lane are basically the subject or the

6  purpose for which the stipulation was executed?

7  A     Primarily; there may be other assets that are pursued,

8  but, primarily, they're the largest part of the assets.

9  Q     And isn't it true, if all of Bartolacci's claims are

10 proven, would you acknowledge that she has a due process

11 property right to those proceeds?

12            MR. KLESTADT:  Objection.

13            THE WITNESS:  I don't understand the question.

14            THE COURT:  Hang on.  There's an objection

15 interposed.

16            Mr. Klestadt, what's the basis for the objection?

17            MR. KLESTADT:  Well, two, Your Honor.  One, the

18 question is incomprehensible and, second, it calls for a

19 legal conclusion by Mr. Miller, who has testified that he's

20 not a lawyer.

21            THE COURT:  It does call for a legal conclusion.

22 Ms. Malik, I'll give you an opportunity to rephrase the

23 question.

24            MS. MALIK:  Thank you.  Give me one second, Judge.

25            THE COURT:  Take your time, no hurry.

1           (Pause)

2    BY MS. MALIK:

3    Q    Mr. Miller, I'm going to try to rephrase it.  If

4    Bartolacci's interest in the proceeds from the sale of 40

5    Meadow Lane are proven, would you acknowledge that the

6    stipulation seeks to deprive her of her interests in such

7    proceeds?

8               MR. KLESTADT:  Objection.

9               THE WITNESS:  I would pose the opposite.

10              THE COURT:  All right, Mr. Miller has answered his

11   question.

12              THE WITNESS:  I'm sorry, Your Honor.

13              THE COURT:  No, that's --

14              THE WITNESS:  Whoever I said it, I can't hear.

15   I've got bad ears, so they'll have to speak up louder.

16              THE COURT:  Not a problem.  I will accept the

17   answer.

18              You may proceed.

19              MS. MALIK:  Thank you, Your Honor.

20   BY MS. MALIK:

21   Q    And, Mr. Miller, do you -- withdrawn.

22        Isn't it true that the property in question was sold in

23   April of 2021?

24   A    Yes.

25              MS. MALIK:  I have no further questions, Your

1  Honor.

2          THE COURT:  Okay.  Mr. Carroll -- actually, Mr.

3  Klestadt, did you have any questions for Mr. Miller?

4          MR. KLESTADT:  Your Honor, just maybe one

5  question.

6                    CROSS-EXAMINATION

7  BY MR. KLESTADT:

8  Q     Mr. Miller, Ms. Malik asked you -- just asked you a

9  series of questions about what you acknowledge with regard to

10 the proceeds with regard to the causes of action.  In fact,

11 Mr. Miller, you haven't made any decisions with regard to who

12 may be entitled to the proceeds; isn't that correct?

13 A     That's correct.

14 Q     And isn't it true, Mr. Miller, that your understanding

15 is that the stipulation merely preserves the estates' rights

16 in whatever the proceeds and recoveries might be, and then

17 any distributions of those proceeds will be subject to

18 further order of the bankruptcy court?

19 A     I'd like to correct my testimony that I just gave you.

20 I think I -- I think it's Section 726, that I agreed that the

21 distribution would be under 726 of the bankruptcy code, and

22 then -- so that means all rights under 726 are preserved, and

23 so the equity security holders would be part of that.  If

24 other pleadings are filed in the future, then they'd be filed

25 in the future, but they haven't been filed and are not part

1  of the decision at this point in time.

2  Q     But any further distribution of proceeds, your

3  understanding is, pursuant to the stipulation, that would be

4  subject to further order of the bankruptcy court?

5  A     That's correct.

6         MR. KLESTADT:  I have no further questions, Your

7  Honor.  Thank you.

8         THE COURT:  Here's what we'll do.  That was a

9  relatively friendly cross.  I think what I'll do is allow Mr.

10  Carroll to provide any redirect, and then I would afford an

11  opportunity to both Ms. Tancredi and Ms. Malik an opportunity

12  to cross-examine a little further on what Mr. Klestadt may

13  have raised or that Mr. Carroll will raise.

14         Mr. Carroll, do you have any redirect?

15         MR. CARROLL:  No, sir.

16         THE COURT:  Ms. Tancredi, did Mr. Miller's

17  testimony and his colloquy with Mr. Klestadt give rise to any

18  redirect that you wish to present?  I'm happy to afford you

19  the opportunity.

20         MS. TANCREDI:  No, Your Honor.  I would just

21  observe, as you did, that it was a very friendly cross-

22  examination.  So, to the extent that the testimony was

23  directed by leading questions, Your Honor can take it for

24  what it's worth.

25         THE COURT:  So noted.

1          Ms. Malik?

2          MS. MALIK:  Nothing further, Your Honor.

3          THE COURT:  Okay.  All right.  Then I think what

4  I'd like is to hear from the parties.

5          Mr. Carroll, I assume the trustee rests, no

6  additional witnesses or testimony?

7          MR. CARROLL:  That is correct, Your Honor.

8          THE COURT:  All right.  And the parties have

9  previously advised that there were no other witnesses, so I

10 think if we can have any kind of brief closings or

11 observations.  Again, I think we covered a lot of the

12 waterfront in the openings, which were helpful, because

13 there's a complicated both business and procedural history

14 here and it was helpful to hear from all of the parties, but

15 I'd start with Mr. Carroll, then Mr. Klestadt, then Ms.

16 Tancredi, and Ms. Malik.

17         So, Mr. Carroll?

18         MR. CARROLL:  Your Honor, many of the comments and

19 the questioning which has occurred basically exhibits an

20 intrinsic misunderstanding of the purpose of the stipulation.

21         The stipulation was entered into because there was

22 an ongoing state court proceeding, which in part had to do

23 with the disposition of sale proceeds, which would have been

24 the asset of EAM.  The trustee, as was indicated a moment

25 ago, was acting clearly in the best interests of the estate

1  to make sure, to the extent there was a recovery with respect

2  to any of those sale proceedings -- they were going nowhere;

3  they weren't going to YH, they were coming to him to run

4  through the bankruptcy estate.

5        To the extent the parties are making arguments

6  with respect to due process rights, this case is loaded with

7  due process.  They have the due process of participating in

8  the state court proceeding, to the extent Ms. Bartolacci

9  wants to participate.  She's a party, she's participating

10  there, Ermitage is participating there.  The monies flow into

11  the estate as part of the waterfall, there's a claims review

12  process which is provided for in the bankruptcy code.  The

13  trustee will review the claims; to the extent there are

14  objections, there will be objections.  If there is a surplus

15  based upon any proofs of claim, then it will flow in

16  accordance with 726.

17        There is the provision within the stipulation

18  that, to the extent there's a charging order that's obtained

19  on an interest which is held, that would have to be an

20  adjudication, that would have be an adjudication that takes

21  place.  Again, due process rights would be afforded to the

22  parties who are asserting an interest in those underlying

23  membership interests.

24        So this is not about denial of due process, this

25  is about an asset protection case where the assets have moved

1    and it's to put a stop to it at a point in time so that all

2    of the parties can be heard and those rights can be

3    adjudicated.

4             So it's really amazing to me the parties here,

5    sitting here thinking that their rights are somehow being

6    prejudiced, that's quite to the contrary here.

7             Thank you.

8             THE COURT:  Thank you.

9             Mr. Klestadt?

10            MR. KLESTADT:  Your Honor, thank you.  I think the

11   only observation I would make, Your Honor, is that we have

12   the curious situation here where the debtor who filed the

13   case and who filed schedules under penalty of perjury,

14   listing many creditors, including a potential $600 million

15   claim of an affiliate, appears to be acknowledging that this

16   is a surplus case.  I would just ask Your Honor to take that

17   into account while considering the trustee's business

18   judgment.

19            I think it's also curious that it's the debtor and

20   only the debtor that is questioning the trustee's business

21   judgment and Ms. Bartolacci, but no creditor, no purported

22   creditor and certainly not YH, which entered into the

23   stipulation, is questioning the business judgment of the

24   trustee.  I think the trustee has demonstrated that the

25   stipulation certainly falls above the lower level of

1  reasonableness or just the standard, I believe in this

2  District as well, that Your Honor would consider for approval

3  of the stipulation.

4         Thank you, Your Honor.

5         THE COURT:  Very good.  Thank you.

6         Ms. Tancredi?

7         MS. TANCREDI:  Yes, Your Honor.  I think these

8  issues before you are legal in nature and, while there's a

9  lot of color that has been provided to you by arguments of

10  counsel and by the testimony from Mr. Miller, the issues are

11  legal.  And, unfortunately or fortunately, the legal result

12  that should come from the situation before you is not

13  necessarily what is convenient for the trustee.

14         The stipulation is -- as Mr. Miller said, it's a

15  great deal for the trustee.  He doesn't have to do anything.

16  Another party litigates the claim, which belongs to the

17  estate; if they recover anything, they turn it over to Mr.

18  Miller.  They get to get their attorneys' fees paid by the

19  estate, which I'll get to in a minute, and then he agrees

20  that he will not contest the charging order.

21         The problem is that the stipulation is premised

22  upon this case being a surplus case.  And while no creditor

23  are questioning the trustee's --

24         THE COURT:  Is it really?  I think it's premised

25  on that from Mr. Klestadt's point of view, but if he's

1  incorrect, he's agreed to an arrangement whereby any funds

2  would go, they would be distributed by Mr. Miller in

3  accordance with 726, and I expect Mr. Klestadt has done some

4  analysis -- or his client YH has done some analysis and

5  expects that there will be a premium, but what Mr. Miller has

6  done is ensure that the rug doesn't get pulled out from under

7  him, that's how I would read it.

8           MS. TANCREDI:  Well, YH would never agree to this

9  if it was not a surplus case.

10          THE COURT:  I agree with that, but --

11          MS. TANCREDI:  So --

12          THE COURT:  -- but Mr. Miller hasn't predicated

13  his deal on that fact -- or on that premise.

14          MS. TANCREDI:  Well, nevertheless, I think, for

15  purposes of evaluating the stipulation as it is presented and

16  its contemplation that there will be a surplus and what will

17  happen to the surplus, that that's how we should view it --

18          THE COURT:  Okay.

19          MS. TANCREDI:  -- just for this context.

20          These debtors are Delaware limited liability

21  companies and, under the Bax decision, YH does not have

22  standing, couldn't be given standing through these bankruptcy

23  proceedings to pursue an action on behalf of a limited

24  liability company.  And that is a legal question, so why

25  would the Court approve a stipulation that gives YH standing

1  that it otherwise would not have.

2          We've already discussed he constitutional property

3  rights and I'll defer to Ms. Malik on those since those are

4  largely her clients' claims, but a trustee can't summarily

5  give another party standing.

6          And let's look at YH is in relationship to these

7  debtors.  It's not a creditor.  We included it on the

8  bankruptcy schedules because it's in litigation and because

9  of this issue for notice purposes.  It's really a creditor of

10  a member and that's just too attenuated to confer a party-in-

11  interest designation to YH.  So, as a matter of law, the

12  trustee shouldn't give YH 503(e) relief; he shouldn't give

13  them standing to object to claims.

14          The stipulation isn't really neutral, as Mr.

15  Carroll would like the Court to think.  Really, Mr. Miller is

16  pressing his thumb on the scale in favor of YH.  And I will

17  note that in the stipulation itself there's four pages of

18  recitals that are, frankly, unnecessary, but I'm sure will be

19  provided to other courts elsewhere where the trustee agrees

20  that in -- for example, on page 4, the second-to-last whereas

21  clause, the trustee agrees that in the context of the remand

22  motion the trustee and YH, by and through their respective

23  counsel, have also discussed Bartolacci and Ermitage's

24  apparent disregard for procedural defaults on discovery

25  deadlines set by the Supreme Court, including document

1  production and deposition deadlines which have not been

2  extended or continued.  There's also Mr. Miller's expressed

3  concern about the possible rapid dissipation of liquid

4  assets.

5            As Ms. Malik said, this sale happened more than a

6  year ago and there are remedies in state court where parties

7  are concerned about the dissipation of estate assets -- or

8  litigation assets.  One can obtain injunctive relief before

9  judgment, but that didn't happen here.

10           THE COURT:  Okay.

11           MS. TANCREDI:  So, Your Honor, I would just ask

12  Your Honor to deny approval of this stipulation.  The trustee

13  has a fiduciary duty to the debtors and to their members, and

14  a fiduciary duty means that you don't -- at a minimum, that

15  you don't give away their store.  At a minimum, the trustee

16  should be neutral, and he's not neutral in this stipulation.

17           THE COURT:  Thank you.

18           MS. TANCREDI:  Thank you.

19           THE COURT:  Ms. Malik?

20           MS. MALIK:  Thank you, Your Honor.

21           Just to expand on what Ms. Tancredi stated, the

22  concerning thing is, how can the trustee possibly fulfill his

23  fiduciary duty when he's already structured this deal with YH

24  Lex?

25           There are representations in the stipulation, as

1  Ms. Tancredi pointed out, about my clients' alleged defaults

2  on discovery deadlines.  I didn't receive a call from Mr.

3  Carroll to inquire if any of that was true, if there were any

4  actual deadlines set that we did not comply with.  Every

5  single deadline that was set by any court in New York my

6  clients complied with.

7          THE COURT:  Well, I think --

8          MS. MALIK:  So --

9          THE COURT:  Hang on.  I want to make sure that

10  we're singing from the same hymnal.  Those are legitimate

11  concerns and I hear you, but what I have is a recital from

12  the parties that does not constitute a finding or an

13  acceptance by the trustee that certain things have happened.

14  It says, "In the context of the remand motion, the trustee

15  and YH have discussed YH's allegations" --

16          MS. MALIK:  Right.

17          THE COURT:  -- which --

18  MS. MALIK:  And, Your Honor, my point is there were

19  discussions held with YH's counsel, why wasn't a phone call

20  made to my office to discuss those allegations with us?  That

21  is not a fulfillment of the trustee's fiduciary duty to the

22  debtors' members.  A large portion, a huge membership

23  interest is owned by my client.

24          And then, as far as the due process, my client

25  intends to prove at this trial that she contributed $5

1  million to the improvement and the appreciation that led to

2  the creation of these proceeds of her own separate funds that

3  she brought into the marriage, that were not marital funds or

4  marital assets or Meir's funds, who is the judgment debtor.

5  My client was never a judgment debtor of YH Lex.

6         And, again, I would reiterate all the arguments

7  made by Ms. Tancredi earlier today and request that this

8  stipulation be disapproved based upon all of the arguments

9  we've stated here today.

10        Thank you, Your Honor.

11        THE COURT:  Thank you.

12        Okay.  The matter before the Court is the

13  trustee's motion for an order approving the stipulation that

14  the trustee has entered into with YH Lex Estates pursuant to

15  Rule 9019.  I will grant that motion and I will overrule the

16  objections that were presented.

17        In so ruling, I first note that the Court

18  acknowledges this matter has been presented on an expedited

19  basis pursuant to reasons laid out by the trustee in his

20  submission last week.  The Court specifically provided that

21  objections could be raised at today's hearing, recognizing

22  the time pressures of the scheduling.  And the Court very

23  much appreciates the engagement of counsel objecting and the

24  submission of the response of the debtors in opposition.

25        This is, as I said a few moments ago, a relatively

1  complicated procedural and factual scenario, again, presented

2  on an expedited basis, but I would observe that, especially

3  given the development of the record in today's hearing, I do

4  not regard this matter as a close call.

5          The trustee is appointed as the Chapter 7 trustee

6  for purposes of administering these Chapter 7 cases.  The

7  record reflects that the trustee engaged promptly and

8  negotiated with YH, and has come up with a stipulated order

9  presented to this Court that in Mr. Miller's, I think, blunt

10 testimony said there's a benefit that any money from a New

11 York litigation comes into the estate for him to hold and to

12 administer consistent with the code.  He found that the

13 stipulation is in the best interests of the estates that he

14 is charged with administering and that he has the opportunity

15 to collect and hold money and has effectively given up very

16 little at this point.

17         I am sensitive to the concerns expressed by the

18 objectors about the speed with which this was presented and

19 their concerns regarding the sufficiency of Mr. Miller's

20 investigation into this process.  But I do believe,

21 consistent with Mr. Carroll's comments, that as a practical

22 matter there is significant process and due process that

23 remains because the stipulation does not provide for monies

24 to be handed over to any party immediately or promptly, but

25 rather to come into the estate for administration by the

1  trustee under the jurisdiction and supervision of this Court.

2          So I think that it is an elegant resolution which

3  evaluates and, frankly, balances the trustee's estimation of

4  what would be best for the stakeholders in this case and that

5  is his responsibility.  He has noted that, as a practical

6  matter, it is the expectation of the parties that there will

7  be sufficient funds to call this a surplus case.  And, as a

8  further observation -- and, again, I think the record is

9  developed here -- any distribution of funds that would be

10  characterized as surplus or otherwise are going to be the

11  subject of proceedings in this Court, I assume, or in another

12  court of competent jurisdiction for purposes of deciding who

13  gets what funds.

14          So I do believe that this stipulation is squarely

15  within the judgment and discretion that is afforded to a

16  Chapter 7 trustee.  I note, as Mr. Klestadt has observed,

17  that the debtors are objecting -- or the debtor is objecting

18  here, and the fact of the matter is that the debtor is the

19  entity that chose to put this into a Chapter 7 and place this

20  entity under the control and jurisdiction of the Chapter 7

21  trustee and this Court.  The trustee has made a decision and

22  entered into an agreement consistent with and in furtherance

23  of his statutory du ties and his fiduciary duties, and I am

24  satisfied that he has carried that burden.

25          The parties' submissions do identify that we're

1  treating this as a -- it is a settlement under Bankruptcy

2  Rule 9019 and I look at the four factors.  The parties didn't

3  necessarily really walk through or address the factors here,

4  but I think that they are certainly implicitly addressed in

5  today's record and they're laid out with specificity in the

6  trustee's submission on the 25th of April.  And,

7  specifically, they are factors that courts have typically

8  used, those factors are not in controversy, but to me, at the

9  end of the day, the analysis is driven by the standard that

10 courts have typically applied, which is that a Rule 9019

11 settlement is going to be considered by a court in light of

12 the proposition that settlements are favored in bankruptcy

13 and that a settlement will be approved so long as it rises

14 above the lowest point on the range of reasonableness.

15         There is no doubt before me that this settlement

16 certainly exceeds that standard, and I'm satisfied that the

17 record today and Mr. Miller's testimony are sufficient to

18 provide for entry of the stipulation.

19         Mr. Carroll, I would ask, has the stipulation been

20 -- I know it's on the docket as an attachment, but I would

21 ask that you simply file that under a certification.  It will

22 be entered promptly because I am aware that there are

23 proceedings this afternoon in another forum and I would like

24 to have that order -- that stipulation entered so that

25 parties can advise the court in that proceeding today and

1  tomorrow that in fact the stipulation has been approved and

2  is of record on the docket.

3          I would ask, are there any question?

4          MS. TANCREDI:  Your Honor, this is Lisa Tancredi.

5  I do have a couple of questions.

6          THE COURT:  Okay.

7          MS. TANCREDI:  The provisions in the stipulation

8  where the trustee consents to YH having standing to object to

9  claims and consent to YH being able to recover funds from the

10 proceeds as a substantial contribution claim.  I just want to

11 clarify that that is merely the trustee's consent and is not

12 binding upon the Court or other parties, and that other

13 parties retain the ability to object.

14         THE COURT:  I would -- I will observe, I

15 appreciate your clarification on that point.  I think we did

16 address specifically this during the examination and during

17 the hearing to the extent that there was any uncertainty.

18 And I believe I polled both Mr. Carroll and Mr. Klestadt to

19 confirm that in fact the Court is not granting standing today

20 and the Court is not authorizing any surplus distribution or

21 otherwise or allowing a 503(b) application.  The trustee has

22 in his negotiations with YH agreed that he would not oppose

23 those, debtor I believe if any party has standing or

24 authority to participate, then there will be further

25 proceedings and the Court will conduct those proceedings.

1    That's my understanding and I am seeing Mr.

2    Klestadt nod and I believe I saw Mr. Carroll nod, but I would

3    ask that both of you gentlemen just confirm that I got it

4    right.  I do believe this is precisely what we discussed a

5    few moments ago.

6         Mr. Klestadt?

7         MR. KLESTADT:  Your Honor, Tracy Klestadt.  Yes,

8    that's correct.  We would be still required to file an

9    application for substantial contribution under Section

10   503(b), on notice to all creditors and approval by the Court.

11        THE COURT:  So noted.

12        Mr. Carroll?

13        MR. CARROLL:  That is correct, Your Honor.

14        THE COURT:  Very good.  All right.

15        Ms. Tancredi, any other questions?

16        MS. TANCREDI:  No, Your Honor.  Thank you very

17   much.

18        THE COURT:  Sure.  All right.  Any other parties

19   with questions?

20      (No verbal response)

21        THE COURT:  Very good.

22        Again, I appreciate everyone's time this morning.

23   Mr. Carroll, I'll look for that order under certification and

24   we'll have that entered today.  Again, I think it would be

25   helpful to the New York court to know that the stip has been

1  entered and so there's no slip between the cup and the lip.

2          With that, again, I appreciate everyone's time

3  this morning.  We are adjourned.

4          COUNSEL:  Thank you, Your Honor.

5      (Proceedings concluded at 11:38 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATION

2           We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    May 16, 2022

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    May 16, 2022

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25